629 A.2d 272

**W.C. McQUAIDE, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 29, 1993.

Decided July 21, 1993.

David H. Radcliff, for petitioner.

R. Knickerbocker Smith, Jr., Asst. Counsel, for respondent.

Before SMITH and KELLEY, JJ., and LORD, Senior Judge.

KELLEY, Judge.

W.C. McQuaide, Inc. (McQuaide) appeals from an order of the Pennsylvania Public Utility Commission (PUC) which adopted a decision of the administrative law judge (ALJ) which held that McQuaide violated the Public Utility Code [1] when it entered into a lease arrangement with Keystone Courier (Keystone). McQuaide, a licensee of the PUC, executed two agreements with Keystone, a non-licensee of the PUC. The PUC order reduced the fine imposed by the ALJ from $50,000 to $2,000. We affirm.

By order entered June 26, 1991, the PUC instituted an order to show cause against McQuaide. The order directed McQuaide to show cause why its certificate of public convenience should not be revoked or suspended, or why other appropriate action should not be ordered for violation of PUC

[1]. Act of July 1, 1978, P.L. 598, *as amended,* 66 Pa.C.S. §§ 101–3315.

regulations at 52 Pa.Code §§ 31.32(c)(2)(iv)(A) and (B) [2] pertaining to the augmenting and rental of equipment by motor carriers and for violating section 1102(a)(3) of the Code, 66 Pa.C.S. § 1102(a)(3). [3] McQuaide filed an answer to the order to show cause on August 14, 1991.

A hearing was held before the ALJ on December 3, 1991. The ALJ made the following findings of fact which were adopted by the PUC.

McQuaide is a corporation holding common carrier authority from the PUC at Docket No. A–00084290, Folder 2 and maintains its principal place of business at 153 Macridge Avenue, Johnstown, Cambria County, Pennsylvania. On August 28, 1990, Keystone agreed to lease motor vehicles to McQuaide for a term of twelve months. As a result, Keystone

2. PUC regulations 52 Pa.Code §§ 31.32(c)(2)(iv)(A) and (B) provide as follows:

§ 31.32. Equipment.

. . . .

(c) *Augmenting equipment.* The augmenting of equipment shall conform with the following:

. . . .

(2) *Contract requirements.* A contract is subject to the following:

. . . .

(iv) *Exclusive possession, control and responsibility.*

(A) *Lease.* A lease shall provide for and be carried out so that the possession, control and use of the equipment is the complete and exclusive responsibility of the lessee for the full term of the lease, except during the period provided for in clauses (B) and (C).

(B) *Sublease.* The lease agreement may contain a provision permitting the lessee to sublease equipment to other motor carriers for a period not exceeding the duration thereof, if the sublessee assumes full responsibility in the manner set forth in clause (A).

3. Section 1102(a)(3) of the Code provides, in part, as follows:

§ 1102. Enumeration of acts requiring certificate

(a) General rule.—Upon the application of any public utility and the approval of such application by the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, it shall be lawful:

. . . .

(3) For any public utility ... to acquire from, or to transfer to, any person or corporation ... by any method or device whatsoever, including the sale or transfer of stock and including a consolidation, merger, sale or lease, the title to, or the possession or use of, any tangible or intangible property used or useful in the public service.

currently leases equipment to McQuaide pursuant to said motor vehicle equipment lease (agreement).

Keystone's owner, Carol Ann Maloni, informed its shippers that from August 28, 1990, the service would be under the control of McQuaide and expressed this to shippers over the telephone thereafter. Under the terms of the agreement, Keystone, as lessor, agreed to furnish, provide and pay for the following:

1. fuel, tires, maintenance, etc. for the vehicles covered by the lease;
2. comprehensive and collision insurance covering the leased vehicles;
3. license or registration charges or fees;
4. a certificate of insurance naming McQuaide as an additional named insured;
5. a certificate of insurance evidencing the carriage of worker's compensation covering lessor's drivers;
6. any cargo insurance deemed necessary by McQuaide and all placards or identifying devices.

McQuaide, as lessee, agreed, under the terms of the agreement, that the leased vehicles would be under its sole and exclusive operational control and management. McQuaide, as lessee, also agreed to pay Keystone, the lessor, eighty-five percent of the gross revenues earned by the vehicles.

McQuaide provided Keystone with a copy of its operating authority as soon as the agreement went into effect but in May or June 1991, McQuaide provided Keystone with a copy of its tariff schedule.

McQuaide never took physical possession of the leased vehicles and Keystone maintained physical possession of the leased vehicles throughout the lease. During the lease, one vehicle was garaged at the residence of Carol Ann Maloni, the owner of Keystone, and the other two vehicles were garaged at the residence of Ms. Maloni's step-father.

McQuaide did not conduct a safety inspection of the leased equipment. McQuaide's representatives did not see the leased

vehicles during the term of the lease. Keystone's representatives inspected the vehicles for safety daily.

On February 2 and 8, 1991, McQuaide attempted to authorize Keystone to conduct vehicle inspections mandated by 52 Pa.Code § 31.32(4). Previously, McQuaide did not request inspection reports from Keystone. Until McQuaide received the vehicle inspection reports of the inspections performed by Keystone, McQuaide was unaware of the physical condition of the leased vehicles.

The leased vehicles provided service only under McQuaide's authority. Five shippers were served under the August 28, 1990 agreement. Keystone provided service for the five shippers, prepared invoices for trips by placing McQuaide's stickers on them and mailed them to McQuaide's headquarters. After the agreement went into effect, Keystone charged the five shippers the same rates it had charged before the August 28, 1990, agreement went into effect.

McQuaide had no knowledge of the contents of shipments made by the leased vehicles until it received the invoice prepared by Keystone. It could not bill the shippers until it received this information. Keystone provided service for a shipper, Burrows Company, prior to entering the lease. Before the lease, Keystone billed Burrows directly, but after the lease, it forwarded Burrows' weekly invoices to McQuaide and McQuaide billed Burrows.

After signing the agreement, Keystone received from McQuaide placards, invoices and stickers with McQuaide's name and address on them. After the lease went into effect, the main change Keystone made in servicing the Burrows account was to place McQuaide's stickers on the invoices and McQuaide's placards on the vehicles.

The arrangement between McQuaide and Keystone generated $57,378 in gross revenues to McQuaide from August 28, 1990 through June 30, 1991.

On July 1, 1991, a subsequent written agreement (agency agreement) between McQuaide and Keystone designated Carol Ann Maloni, t/d/b/a Keystone Courier of Pittsburgh, PA, as

McQuaide's "agent". The written "agency" agreement provides, in part, as follows: (1) Keystone is to be considered an independent contractor; (2) Keystone is denied the power to bind or commit McQuaide to any obligations, liabilities or other commitments; (3) Keystone agrees to assume full responsibility for compliance with the rules and regulations of federal and state regulatory bodies; (4) Keystone agrees that it will not operate motor vehicles beyond the scope of McQuaide's authority with respect to the commodities to be transported or the territory to be served; and (5) Keystone agrees to be responsible for the costs and expenses of fines resulting from violations of the regulations of federal and state regulatory agencies.

The owner of Keystone, Carol Ann Maloni, understood that, as McQuaide's "agent", Keystone had permission to run its business as it had prior to entering the lease agreement.

The agency agreement provides that Keystone, as agent, is to be compensated exclusively on a commission basis, the commission being fifteen percent of the gross transportation revenue received by McQuaide from the transportation of shipments. Keystone understands that the commission is for dispatching, billing and accounting services. As McQuaide's "agent", Keystone is expected to placard its vehicles with McQuaide's name and PUC number, keep its vehicles in the proper condition and have them driven only by qualified drivers.

Keystone does not have a certificate of public convenience from the PUC and did not have such a certificate before, during, or after the agreement with McQuaide.

Based upon the above findings of fact, the ALJ concluded that (1) neither the agreement dated August 28, 1990, nor the agency agreement dated July 1, 1991 between McQuaide and Keystone nor any other actions taken by them constituted a principal/agency relationship; (2) McQuaide did not meet its burden of proving the existence of a principal/agency relationship between itself and Keystone; (3) McQuaide did not maintain exclusive possession, control and use of the equip-

ment it leased from Keystone; (4) McQuaide did not meet its burden of proving that it had not violated 52 Pa.Code §§ 31.-32(c)(2)(iv)(A) and (B) and section 1102(a)(3) of the Code; and (5) McQuaide violated 52 Pa.Code §§ 31.32(c)(2)(iv)(A) and (B) and section 1102(a)(3) of the Code.

The ALJ recommended to the PUC that the complaint instituted against McQuaide be sustained, that McQuaide be ordered to pay a civil penalty of fifty thousand dollars ($50,-000), and that McQuaide cease and desist from further violations of the Code or any of the rules or regulations of the PUC.

■ McQuaide filed exceptions to the ALJ's initial decision. By order entered August 6, 1992, the PUC overruled in substantial part McQuaide's exceptions and adopted the initial decision of the ALJ as the decision of the PUC finding that McQuaide was in violation of the Code and regulations. However, the PUC reduced McQuaide's civil penalty to two thousand dollars ($2,000). McQuaide's petition for reconsideration and stay of the PUC's order entered August 6, 1992 was denied by the PUC by order entered November 12, 1992. McQuaide now appeals to this court.[4] On appeal, McQuaide sets forth several questions in its statement of the questions involved; however, the questions presented may be formulated into three issues. First, whether the burden of proof in this case is governed by section 332(a), 66 Pa.C.S. § 332(a), or section 315(c), 66 Pa.C.S. § 315(c), of the Code. Second, whether McQuaide, as a regulated carrier, is prohibited from appointing Keystone, the owner of the equipment, from also acting as its agent when the PUC has not published any restrictions prohibiting an agent from leasing equipment from any particular source. Third, whether an agency relationship existed between McQuaide and Carol Ann Maloni, t/d/b/a

---

**4.** The scope of review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law committed and whether the PUC's findings are supported by substantial evidence in the record. *Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 561, 493 A.2d 653 (1985).

Keystone Courier of Pittsburgh, PA, the owner of the leased equipment.

## I.  BURDEN OF PROOF

■ The PUC, in overruling McQuaide's first exception to the ALJ's initial decision, agreed with the ALJ in his conclusion that McQuaide had the burden of proof in this case pursuant to section 315(c) of the Code, 66 Pa.C.S. § 315(c). McQuaide argues that the applicable burden of proof is found in section 332(a) of the Code which provides that the proponent of a rule or order has the burden of proof.  66 Pa.C.S. § 332(a).  McQuaide contends that section 315(c), which places the burden of proof upon the carrier in any proceeding upon the motion of the PUC involving the service or facilities of any public utility, is not applicable in this case because this is not a question of whether the service or facilities of a carrier are adequate, efficient, safe or reasonable.  66 Pa.C.S. § 315(c).

Section 102 of the Code defines "Service" as:

[u]sed in its broadest and most inclusive sense, includes *any and all acts* done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, or contract carriers by motor vehicle, in the performance of their duties under this part to their patrons, employees, other public utilities, and the public, as well as the interchange of facilities between two or more of them."

66 Pa.C.S. § 102 (emphasis added).

"Facilities" are defined by the Code as:

*[a]ll the plant and equipment of a public utility,* including all tangible and intangible real and personal property without limitation, and *any and all means and instrumentalities in any manner owned, operated, leased,* licensed, used controlled, furnished or supplied for, by, or in connection with, the business of any public utility.

*Id.* (emphasis added).

The primary issue in this case is whether or not McQuaide complied fully with the PUC's regulations regarding the aug-

menting and renting of equipment. 52 Pa.Code § 31.32. 52 Pa.Code § 31.32(c)(4) imposes a duty upon a motor carrier before taking possession of equipment to inspect or to have the equipment inspected to insure that the equipment is in a safe condition to be operated on the highways.

The terms "service" and "facilities" are broadly defined in the Code. Given the broad definitions of "service" and "facilities" in the Code and the requirement that a motor carrier leasing equipment is to conduct a safety inspection of the leased equipment, it is clear that the consideration of the safety of the leased vehicles or facilities brings this case within the provisions of section 315(c) of the Code. Accordingly, the ALJ and the PUC did not commit an error of law by placing the burden upon McQuaide in this case pursuant to section 315(c) of the Code.

## II. AGENTS AUTHORITY TO LEASE EQUIPMENT

■ Next, McQuaide asserts that the PUC may not impose unpublished restrictions on the use of agents by motor carriers. McQuaide argues that there is nothing in the PUC's regulations which prohibit an agent from leasing equipment from any particular source, including the agent himself or herself. McQuaide contends that if the PUC wishes to impose general criteria restricting agents from leasing equipment, the PUC must do so through the rule making process.

The PUC contends that the definitional section of 52 Pa. Code § 31.32 discloses that one cannot be appointed an agent to represent the interests of both the lessor and lessee in an equipment lease situation. 52 Pa.Code § 31.32(b), Definitions, defines "authorized employe or agent" as "a person authorized to act for and on behalf of a motor carrier or owner of equipment and subject to the supervision, direction and control of the motor carrier in whose service he is acting."

The PUC argues that the use of the word "or" in the above quoted regulation defining the term agent, justified its conclusion that its regulations at 52 Pa.Code §§ 31.32 and 31.33, which authorized McQuaide to supplement its fleet by leasing

vehicles, restricted McQuaide from appointing Keystone, the owner of the equipment, from also acting as its agent to exercise control and management over the leased equipment.

■ An agency's interpretation of its own regulations, unless clearly erroneous or inconsistent with the statutory mandate, is entitled to persuasive weight. *Hamburg v. North Penn School District,* 86 Pa.Commonwealth Ct. 371, 484 A.2d 867 (1984). We agree with the PUC's interpretation of the definition of agent in the PUC regulations.

"Agent" is defined as a person authorized to act for or on behalf of a motor carrier *or* the owner of the leased equipment. 52 Pa.Code § 31.32(b). As a result, under 52 Pa.Code § 31.32, a motor carrier or owner of the lease equipment may appoint an agent to represent their interests in the leasing arrangement. Under 52 Pa.Code § 31.32(c)(2)(ii), an agent may be appointed to sign the lease on behalf of either the motor carrier or the owner of the equipment. Under 52 Pa.Code § 31.32(c)(3), an agent may be appointed to accept on behalf of the motor carrier, possession of the leased equipment from the owner of the equipment. Under 52 Pa.Code § 31.-32(c)(4), an agent may be appointed to conduct, on behalf of the motor carrier, safety inspections of the leased equipment.

If this court were to accept the proposition that because the regulations do not set forth any explicit restrictions prohibiting an agent from leasing equipment from any particular source, the agency arrangement between McQuaide and Keystone is valid, this court would in effect be condoning regulated carriers to franchise unregulated carriers such as Keystone, without any direct oversight by the PUC. Under the arrangement between McQuaide and Keystone, McQuaide has transferred its duties and responsibilities as lessee back to Keystone, the owner of the equipment.

The regulations clearly state that the lessee, McQuaide in this instance, must have possession, control and use of the equipment for the full term of the lease. 52 Pa.Code § 31.-32(c)(2)(iv)(A). In this case, the record clearly shows that through the purported agency agreement entered into be-

tween McQuaide and Keystone, Keystone, as owner of the equipment and McQuaide's "agent", has exclusive possession, control and use of the equipment. McQuaide's only function as lessee of the leased equipment is to bill the five shippers Keystone services. Based on the arrangement entered into between Keystone and McQuaide, Keystone, not McQuaide, is the for-hire carrier. This arrangement clearly circumvents section 1102 of the Code by allowing unregulated carriers to provide services to the public without the required certificates of public convenience and regulation by the PUC.

## III. EXISTENCE OF AGENCY RELATIONSHIP BE- TWEEN McQUAIDE AND CAROL ANN MALONI, t/d/b/a, KEYSTONE COURIER OF PITTSBURGH, PA

Finally, McQuaide argues that an agency relationship existed between itself and Carol Ann Maloni or Keystone since August 28, 1990. A review of the record reveals that the ALJ's findings that an agency/principal relationship did not exist between McQuaide and Keystone are supported by substantial evidence.

Accordingly, the order of the PUC entered August 6, 1992 is affirmed.

## ORDER

NOW, this 21st day of July, 1993, the order of the Pennsylvania Public Utility Commission, dated August 6, 1992, at No. A–00084290C911, is affirmed.